KEVIN J. NASH, ESQ.
GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

Return Date:
June 24, 2010
2:00 P.M.

Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re:                                          Chapter 11

Mymon Realty Inc.,                              Case No. 10-12488(MG)

                                    Debtor.
---------------------------------------------------------x

## DEBTOR'S OPPOSITION TO MOTION OF
## CSMC CANAL STREET LLC TO DISMISS THE
## CHAPTER 11 CASE OR OBTAIN RELIEF
## FROM THE AUTOMATIC STAY

**TO THE HONORABLE MARTIN GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

The debtor herein, Mymon Realty Inc. ("Mymon" or the "Debtor"), as and

for its opposition to the motion (the "Motion") of CSMC 2007-C3 Canal Street, LLC

("CSMC") for dismissal of the Chapter 11 case, or alternatively, relief from the automatic

stay, respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      Indicting the Debtor on the premise that it is a single asset real

estate enterprise, CSMC has unfairly raised the banner of bad faith in moving to dismiss

the Chapter 11 case, while ignoring its own wrongdoing that precipitated the necessity for

the bankruptcy filing in the first place.  CSMC's Motion presents only half of a tale

(incomplete at that), under which CSMC conveniently divorces itself from alleged unlawful and improvident lending practices in the origination of the underlying mortgage.

2.      In reality, the Chapter 11 case was filed in the utmost good faith, as bankruptcy not only offers the most efficient forum to take corrective action to remedy the current operational issues that plague the subject property, but bankruptcy also allows the Debtor to challenge the conduct of CSMC and the prior lenders without the spectacle of having the subject property become a hostage in the process.

3.      In seeking Chapter 11 relief, the Debtor was aware of the probability of a knee-jerk reaction from CSMC to seek immediate dismissal of the bankruptcy case. Accordingly, the Debtor is moving swiftly on a path of reorganization and is contemporaneously seeking authorization to fund installation of a sprinkler system, which is a necessary pre-requisite to obtaining a proper residential certificate of occupancy.

4.      In addition, the Debtor has also formally commenced an adversary proceeding against CSMC and its predecessors, most notably Column Financial Inc. ("Column Financial"), which asserts a number of claims resulting from the improper issuance of the underlying mortgage loan. For the Court's ready reference, a copy of the Debtor's adversary complaint is annexed hereto as Exhibit "A". In light of the adversary proceeding, it cannot be presumed that CSMC has a valid secured claim for the amounts alleged to be due.

5.      It is far too early in the proceeding for the Court to discount any reasonable possibility of the Debtor's reorganization. Given the harm that CSMC and its predecessors have contributed to, if not inflicted, the Debtor should be afforded a fair

opportunity to save its property. Accordingly, CSMC's Motion should be denied consistent with one of the fundamental tenets of bankruptcy: "The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the honest but unfortunate debtor." Marama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007) (citing Grogan v. Garner, 498 U.S. 279 (1991)).

6. While much of the background facts relevant to the issues raised by CSMC are enumerated in the Debtor's companion financing motion and adversary complaint, certain facts bear re-emphasis for continuity.

## BACKGROUND

7. In late 2006 or early 2007, MM Canal Realty, Inc. ("MM") approached the Debtor's principal, Oded Adri, and offered him the opportunity to purchase the building and property located at 334 Canal Street, New York, New York (the "Property") for $11 million. (Complaint ¶ 10).

8. The Property itself was constructed in 1910 and today contains five (5) floors. The second, third, fourth and fifth floors were occupied for residential use and contain five (5) relatively large apartment units. (Complaint ¶ 11) The basement and first floor of the Property are used as commercial space and occupied by a retail tenant and affiliate, Canal Street Music Audio Inc., doing business as Uncle Steve's Car Stereo ("Uncle Steve") pursuant to a lease dated May 1, 2007. (Complaint ¶ 12)

9. In order to finance the acquisition, the Debtor obtained purchase money financing from Column Financial, a subsidiary of Credit Suisse Group. (Complaint ¶ 14)

10.     The Debtor selected Column Financial based upon assurances that Column Financial was experienced in making commercial real estate loans and had conducted requisite due diligence regarding the Building, including the legality of the tenant mix, occupancy and rent structure. (Complaint ¶ 15)

11.     Prior to the closing of the sale transaction, the Debtor was provided an appraisal (the "Original Appraisal") dated January 25, 2007 that was ordered by Column Financial and prepared by Leitner Group, Inc. (the "Leitner Group"). (Complaint ¶ 16)  A copy of the Original Appraisal is annexed hereto as Exhibit "B". The Original Appraisal stated that the value of the Property was approximately $14.8 million.

12.     The Original Appraisal noted that it was legally permissible for the Building to be occupied by residential tenants. (Original Appraisal at pp. 74-75) The Original Appraisal did not note that the Property lacked a certificate of occupancy or that the presence of a certificate of occupancy that conformed to the Property's use was necessary for the Property to operate or sustain its projected value. (Complaint ¶ 17)

13.     The Original Appraisal was one of several communications in which Column Financial indicated to the Debtor a substantial value for the Property but failed to disclose any infirmities or harm to the value of the Property arising from the lack of a residential certificate of occupancy. (Complaint ¶ 18)

14.     In light of Column Financial's expertise, experience and assurances that it would engage in due diligence that would have the practical effect of protecting the interests of both lender and borrower, the Debtor reasonably relied upon the Original Appraisal and all other statements made by Column Financial and its agents

while assessing whether to purchase the Property and close on the mortgage. (Complaint ¶ 19)

15.     At the time that MM offered the Debtor the Property, the Property did not have a residential certificate of occupancy despite that, on information and belief, the second, third, fourth and fifth floors were fully occupied by residential tenants. (Complaint ¶ 13)

16.     The Debtor knew that the Property lacked a residential certificate of occupancy and automatic sprinkler system, but, due to Column Financial's misrepresentations and the Debtor's prior real estate and closing attorney's failure to inform of the illegality of the contemplated use as then constituted, the Debtor was not aware of the legal consequences and ramifications of operating the Property without a residential certificate of occupancy and automatic sprinkler system. (Complaint ¶ 31)

17.     However, as a condition to closing the mortgage, the Debtor was required to deposit $165,600 in a reserve account (the "Capital Reserve") at closing that could be drawn upon for capital expenditures necessary to procure the residential certificate of occupancy and automatic sprinkler system. (Complaint ¶ 34)

18.     The Capital Reserve was established to attempt to facilitate receipt of a residential certificate of occupancy and automatic sprinkler system, but Column Financial knew, or should have known, or was negligent in not knowing, that this was not a legal, correct or proper solution. (Complaint ¶ 35)

19.     Column Financial conditioned the mortgage on the Debtor making certain covenants that cannot be reconciled with the continued illegal residential occupancy of the Property. Among other things,, in the Amended, Restated and

Consolidated Mortgage and Security Agreement (the "Mortgage and Security Agreement"), the Debtor was required to covenant that it would "operate the Property as a mixed used building consisting of residential apartments and a commercial unit for so long as the indebtedness secured hereby is outstanding." (Mortgage and Security Agreement § 1.17)

20. Further, the Debtor was required to covenant that it would "at all times comply with all statutes, ordinances, regulations and other governmental or quasi-governmental requirements and private covenants now or hereafter relating to the ownership, construction, use or operation of the Property" and that "Borrower shall not use or occupy, or allow the use of occupancy of, the Property in any manner which violates . . . any applicable law, rule, regulation or order." (Mortgage and Security Agreement § 1.24(a))

21. Under the circumstances, these covenants only served to confirm that Column Financial badly misled the Debtor as to the viability of continued leasing at the Property without a residential certificate of occupancy and automatic sprinkler system. Regrettably, Column Financial appeared intent on reaping significant fees and interest from the loans, leaving the Debtor with the economic fall-out caused by the lack of a certificate of occupancy.

22. In late-summer or early-fall of 2009, the Debtor retained new counsel in the person of Goldberg Weprin Finkel Goldstein LLP. By and through its counsel, the Debtor learned of the health, safety, welfare and legal consequences of operating the Property without a residential certificate of occupancy. (Complaint ¶ 38) Also, in September 2009, and in the interests of protecting innocent parties, the Debtor

requested that all existing residential tenants leave the Property because their safety could not be assured. (Complaint ¶ 38).

23. Despite this request, certain residential tenants remained at the Property but refused to pay rent. Given the lack of a certificate of occupancy, the Debtor is likely prohibited from seeking a summary proceeding against such tenants and is prevented from obtaining new tenants for vacant apartments. Currently four apartments are vacant and one unauthorized squatter remains. (Complaint ¶ 39).

24. Before bankruptcy, the Debtor attempted to engage LNR Partners, Inc. ("LNR Partners"), as special servicer for Bank of America, N.A., as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C3 ("Bank of America"), and, later, CSMC (Bank of America's successor in interest) in discussions about restructuring and improving the Property so that it could be lawfully rented. In fact, a proposed complaint was forwarded to Herrick Feinstein LLP ("Herrick Feinstein"), now attorneys for CSMC and earlier attorneys for LNR Partners in September 2009 as an invitation for a dialogue. Thereafter, Herrick Feinstein requested execution of a "pre-negotiation" agreement which the Debtor received, commented upon and returned to Herrick Feinstein.

25. Anticipating return of the "pre-negotiation" agreement based on a series of follow-up conversations with Herrick Feinstein, the Debtor was surprised and disappointed to learn that CSMC instead filed a complaint to foreclose on the Property on February 23, 2010. Thereafter CSMC obtained an *ex parte* order appointing Carol Lillienfeld as a receiver. The Debtor was provided no notice of any of the foregoing

until April 7, 2010. (Complaint ¶ 41) Thus, the Debtor had no opportunity to defend against the appointment of the receiver.

26. Given this unexpected turn of events, the Debtor filed a voluntary petition under Chapter 11 of the United States Code on May 7, 2010 and has since continued in possession and management of its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

## PROCEEDINGS IN BANKRUPTCY TO DATE

27. Although CSMC's mortgage is subject to dispute, and without intending to acknowledge the vitality of CSMC's purported interests, on May 14, 2010, the Debtor filed a Motion to Allow Use of Cash Collateral and Authority to Borrow Funds on a Senior Secured Basis (the "Funding Motion"). [Doc. No. 2]

28. In the Funding Motion, the Debtor requests that the Court grant it authority to use the funds remaining in the Capital Reserve (as defined in the Mortgage and Security Agreement), and if necessary, borrow funds from the daughter of the Debtor's principal on a senior secured basis, in order to finance work necessary to acquire a residential certificate of occupancy. [Doc. No. 2] On June 7, 2010, the Debtor filed a Verified Supplement in Support of the Funding Motion. [Doc. No. 11]

29. Also, on June 7, 2010, the Debtor initiated an adversary proceeding against Column Financial, Bank of America, and CSMC. The adversary complaint (the "Complaint") asserts claims for relief (1) declaring the Mortgage and Security Agreement, the Amended, Restated and Consolidated Promissory Note, and all other Loan Agreements unenforceable and/or subject to reduction and abatement, (2) canceling and suspending payments on account of the Note, (3) granting the Debtor

damages for unjust enrichment, and (4) granting the Debtor damages for fraudulent concealment and/or negligent administration.

**CSMC'S NEW APPRAISAL**

30.     In connection with the Motion, CSMC submitted to the Court a copy of a new appraisal (the "New Appraisal") dated as of February 8, 2010 that was commissioned by CSMC and completed by the Leitner Group. [Doc. No. 8, Ex. A] The New Appraisal states that the Property's "as is" market value as of the date of the New Appraisal is $7.1 million. (New Appraisal p. 130) The New Appraisal is based upon the Property continuing to be operated as a rental building or the entire Property being sold to a single purchaser. (New Appraisal pp. 86-129).

31.     The New Appraisal does not consider the Property's value if it were converted to a condominium building and each unit sold separately, which is a realistic possibility, particularly since all but one tenant has now left the Property.

32.     Additionally, the New Appraisal notes that "[t]he valuation herein assumes that a proper Certificate of Occupancy permitting the present use is obtained. It is important to note here that the cost and time involved in obtaining the Residential C. of O. is beyond our expertise, and that these costs could materially affect the property value stated herein." (New Appraisal p. 3)  The New Appraisal even notes that "it is highly unusual for an occupied residential building collecting market rents not to have an appropriate C. of O. however a buyer would require a discount to the market value based upon the added costs to rectify this situation." (New Appraisal p. 3)

33.     On June [21], 2010, David Schechtman Esq. of Eastern Consolidated submitted to the Debtor a letter (attached hereto as Exhibit "C") indicating

his belief of what the Property would be worth if the Debtor were to install an automatic sprinkler system, procure a residential certificate of occupancy, and convert the Property to a condominium. In his view, the Property would have a potential value of $14 million.[1]

## ARGUMENT

### THE DEBTOR FILED ITS CHAPTER 11 PETITION IN GOOD FAITH SO THE BANKRUPTCY CASE SHOULD NOT BE DISMISSED

34. Contrary to CSMC's motion, the Chapter 11 case was commenced for the proper and legitimate purpose of affording the Debtor the opportunity to rehabilitate the Property and negotiate, propose, and confirm a plan of reorganization, the contours of which will depend on the ultimate outcome of the litigation against CSMC and the other defendants.

35. The Debtor understands what needs to be done and has requested authority to use cash collateral and incur post-petition financing in order to fund the installation of the automatic sprinkler system. Also, the Debtor has begun to receive post-petition payments from its commercial tenant of at least $20,000 per month. Prior to bankruptcy, the commercial tenant escrowed certain pre-petition rental payments even though its legal obligation to pay rent remains in question. However, the Debtor is keenly aware of the need to generate income while the parties' respective rights are sorted out. Receipt of income, even on a reduced basis, is certainly a step in the right direction.

---

[1] Mymon intends to submit to the Court a motion for authorization to retain Eastern Consolidated. Eastern Consolidated will be retained to help Mymon identify financing opportunities should the Court not approve the Funding Motion and/or a potential third party investor willing to facilitate confirmation of a chapter 11 plan of reorganization. Eastern Consolidated has already identified begun discussions with several interested investors.

36.     Despite these efforts, and less than three weeks after the Chapter 11 case began, CSMC filed its Motion. The Motion omits critical facts including that CSMC's mortgage is subject to dispute and that the Debtor has requested authority from the Court to use funds in a reserve account to finance the necessary improvements to the Property.

37.     Even more, the Motion omits **any** discussion of the very reason why the Debtor filed for Chapter 11 protection – the absences of a residential certificate of occupancy and an automatic sprinkler system under which Column Financial bears responsibility. Granting the motion would short-circuit the Debtor's good faith reorganization efforts and allow CSMC and its predecessors to evade responsibility for their culpability.

38.     Although CSMC alleges that the Debtor cannot reorganize, it must at least be given an opportunity to do so. The presence of "bad faith" factors does not necessitate the granting of the Motion; many of the factors are only present due to the unlawful and inequitable conduct of CSMC and its predecessors, and in any event, the Court retains discretion as to when to grant the relief requested in the Motion.

### A. Dismissal for Bad Faith Is an Extraordinary Remedy to Be Used Sparingly by the Court

39.     Procedurally, it must be noted that "dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances." In re Century/ML Cable Venture, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003); see also In re Sletteland, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001) (noting that courts dismiss cases on bad faith grounds sparingly); In re 234-6 W. 22nd St.

Corp., 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997); In re Johns-Manville Corp., 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984) (dismissal on bad faith grounds should be granted sparingly, and only upon a clear showing of abuse of bankruptcy process, avoiding an "intense focus on the debtor's motives in filing").

### B. CSMC Has Not Met Its Burden of Establishing Cause to Dismiss the Chapter 11 Case

40. As is well accepted, the precepts of bad faith were developed by the Second Circuit in In re Cohoes Industrial Terminal Inc., 931 F.2d 222 (2d Cir. 1991) and In re C-TC 9th Avenue Partnership, 113 F.3d 1304 (2d Cir. 1997). Under these decisions, the prevailing test combines an analysis of objective futility and subjective bad faith to determine whether a reasonable possibility exists that the debtor will emerge from bankruptcy. See In re 68 West 127th Street LLC, 285 BR. 838, 846 (Bankr. S.D.N.Y. 2002) (synthesizing Cohoes Indust. Terminal and C-TC 9th Avenue) ("The critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy."); In re RCM Global Long Term Corp. Appreciation Fund Ltd., 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ("In this Circuit, a petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found . . . But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing."). Accord In re Sylmar Plaza, L.P., 314 F.3d 1070 (9th Cir. 2002); In re Carolin, 886 F.2d 693 (4th Cir. 1989).

41. It is also well-settled that the burden to establish cause for dismissal rests squarely on the party seeking such relief. In re Greene, 57 B.R. 272, 276

(Bankr. S.D.N.Y. 1986). CSMC has failed to carry its heavy burden in establishing extraordinary circumstances necessary to dismiss this Chapter 11 case or to grant relief from the automatic stay to allow CSMC to proceed against the Debtor's most significant asset.

## C. There Is No Basis for a Finding of Bad Faith

42. In its motion, CSMC focuses entirely on the list of factors enumerated by the Court in C-TC 9th Avenue. But in listing these factors the Second Circuit itself then explained that "[i]t is important to note that this list is illustrative, not exhaustive." 113 F.3d at 1311. Moreover, the court should "not consider these factors in a vacuum, but rather in the context of the totality of the circumstances." In re R & G Properties, Inc., Case No. 08-10876, 2009 WL 1076703, at *2 (Bankr. D.Vt. Apr. 16, 2009).

43. As one court explained, "[t]he existence of 'bad faith' depends not on any one specific factor but on a combination of factors determined after careful examination of the facts of the particular debtor's case." 68 W. 127th St., LLC, 285 B.R. at, 844 (quoting In re Shar, 253 B.R. 621, 629 (Bankr. D.N.J. 1999)). Indeed, the mechanical application of the C-TC factors suggested by CSMC would "automatically doom" almost every single asset case from the outset. Id. It is for that reason that courts have recognized that the C-TC factors "do no more than assist the [Court's] exercise of discretion in deciding when a debtor has improperly invoked the Bankruptcy Code." Id.

44. The inquiry behind a good faith analysis was further explained by the Second Circuit when it stated that "[t]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space

13

in which to return to a viable state. '[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre* . . . .'" C-TC 9th Avenue, 113 F.3d at 1310 (citing In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985)).

45.     Fundamentally, bad faith does not arise merely because the Debtor is a single real estate entity, particularly since the Bankruptcy Code contains a number of provisions giving express recognition to these types of filings. See, e.g. 11 U.S.C. §362(d)(3); In re Balboa Street Beach Club, Inc., 319 B.R. 736, 742 (Bankr. S.D. Fla. 2005) ("[A] single asset real estate [sic] is not per se a bad faith filing, since Congress in the 1994 Amendments to the Bankruptcy Code implicitly allowed single asset real estate cases by assigning a definition to them under 11 U.S.C. § 101(5)(b)"); Collier on Bankruptcy 1112.07[6][b][ii] (16th ed.) ("The presence of the specific single asset real estate provisions strongly suggest that such cases are not per se filed in bad faith.").

46.     CSMC bases much of its allegation of bad faith on the fact that there was a pending state litigation, instituted by CSMC which is now stayed. Even if CSMC is frustrated by this, it does not render the petition to be filed in bad faith, as creditors are often frustrated by bankruptcy. Cohoes Industrial Terminal Inc., 931 F.2d at 228 ("Filing a bankruptcy petition with the intent to frustrate creditors does not by itself establish an absence of intent to seek rehabilitation").

47.     The mere existence of state court litigation is not a sufficient basis alone to support dismissal of a bankruptcy case. As one court found in a similar case,

> The Creditor . . . has not proven by a preponderance of the evidence that the Debtor filed its chapter 11 case as a litigation tactic for the purpose of stalling the Creditor's state court rights, or to open the door for expanded legal sparring of state court issues in bankruptcy court. Its bad faith

arguments are quite conclusory and, in the judgment of the Court, manifest its understandable "frustration" with the Debtor's bankruptcy filing rather than a showing of the Debtor's "abuse of judicial purpose." Simply checking off these factors on the list does not prove bad faith.

In re R & G Properties, Inc., 2009 WL 1076703, at *3 (internal citations omitted). See also In re Kingston Square Assocs., 214 B.R. 713, 734, 736-37 (Bankr. S.D.N.Y. 1997) (eve-of-foreclosure filing not in bad faith because bankruptcy preserved value for handful of unsecured creditors and debtor's limited partners); In re Foundry of Barrington P'ship, 129 B.R. 550, 556 (Bankr. N.D. Ill. 1991) (fully encumbered single asset debtor with few creditors did not file in bad faith because debtor has reasonable prospect, as evidenced by active negotiations with several prospective tenants, of confirming plan).

48. CSMC also alleges that the timing of the Debtor's Chapter 11 cases evidences an intent to delay or frustrate the efforts of CSMC to enforce its rights. However, the Debtor did not file its Chapter 11 petition on the eve of a foreclosure sale, or even after a final judgment had been entered in the state proceedings. Instead, the Debtor filed its Chapter 11 petition shortly after learning of the state court proceedings in order to ensure that this Court would recognize Mymon's good faith in wanting to rehabilitate the Building and not wanting to collaterally attack judgments of the state court.

49. In any event, Mymon should not be penalized for exercising of a statutory right. This Court has recognized that "[k]eeping the primary focus on the permissible uses of the Bankruptcy Code is important because, taken out of context, the exercise of certain rights under the Code that are perfectly legitimate may appear hurtful, even malicious, yet the exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith." 68 W. 127 St., LLC, 285 B.R. at 844 (noting that when a debtor

is motivated by plausible, legitimate reorganization purposes bad faith is not present in a chapter 11 case).

        50.    CSMC also claims that because the Debtor's low cash flow is evidence of its bad faith. However, the Debtor's low cash flow is not the result of bad faith or mismanagement but instead the consequence of its compliance with the law. Without a residential certificate of occupancy and automatic sprinkler system, the Property cannot be occupied. N.Y.C. Admin. Code §§ 27-954 (requiring the installation of an automatic sprinkler system) and 28-18.1 ("No building or open lot shall be used or occupied without a certificate of occupancy issued by the commissioner [of buildings]."). To ensure that buildings such as the Property are not used, landlords like the Debtor are not allowed to collect rents. N.Y.S. Mult. Dwelling L. § 302(1)(b) (if a building lacks a residential certificate of occupancy and needs one, "no rent shall be covered by the owner of such premises for said period, and no action or proceeding shall be maintained therefore, or for possession of said premises for nonpayment of such rent."). See, e.g., 40 Clinton St. Assocs. v. Dolgin, 126 Misc. 2d 373, 375 (Civ. Ct. New York Cty. 1984) ("[A] landlord may not collect rents nor maintain a proceeding therefor where the multiple dwelling in question is occupied in violation of section 301 of the Multiple Dwelling Law requirement of a certificate of occupancy. This rule so enunciated is the expression of the appropriate recognition by the courts that the requirements of section 301 of the Multiple Dwelling Law, designed and intended to ensure that dwellings are safe and fit, can mean little if they are not enforced by recourse to the penalties provided in section 302 of the Multiple Dwelling Law.") (citations omitted); Washington Square Professional Building, Inc. v. Leader, 68 Misc. 2d 72, 73 (Civ. Ct. New York Cty. 1971)

16

("Certainly, where a landlord constructs or converts to a multiple dwelling, said sections of the law stand in the way of his collection of rent until a certificate or a new certificate of occupancy has been issued. The cases are legion, some of them cited by tenant, which support this proposition."); Fazio v. Kelly, 2003 NY Slip Op 51276U (Civ. Ct. Richmond Cty. 2003) (considering circumstances where the owner of a legal two family home illegally rented the basement and all of the tenants refused to pay rent).

  51. Additionally, courts have recognized that mortgagees such as CSMC cannot lawfully demand principal and interest payments from the owner of a building that lacks a certificate of occupancy.  For example, in Howard v. Berkman, Henoch, Peterson & Peddy, P.C., 2004 N.Y. Slip Op. 51470(U), 799 N.Y.S.2d 160 (Table). (Civ. Ct. Richmond Cty. 2004), the court considered the responsibility of the mortgagee for providing financing for a building lacking a certificate of occupancy that it knew the mortgagor intended to occupy unlawfully.   The court unequivocally concluded that the mortgagee "should be precluded from collecting principal and interest payments during the period" because lenders in the State of New York have the legal obligation to insure that an acceptable final certificate of occupancy is delivered on any building purchases they finance. Id. at *10.  See also Divita v. Decker & Decker, Partnership, 2004 N.Y. Slip Op. 51811, 800 N.Y.S.2d 345 (Table) (Civ. Ct. Richmond Cty. 2004). Because the Debtor cannot legally collect rent while the Property lacks an automatic sprinkler system and no residential certificate of occupancy, and because CSMC lacks a right to receive principal and interest payments while the Property lacks these items, CSMC cannot allege that the lack of a current cash flow evidences the Debtor's bad faith.

52. CSMC also asserts that the Debtor has few other creditors and that the Debtor's condition is really a two-party dispute between the Debtor and CSMC. This is untrue. The Debtor has other creditors whose claims need to be addressed, including the City of New York in connection with a potentially substantial litigation claim. Additionally, the Debtor has already asserted claims against CSMC, Bank of America, and Column Financial and intends to pursue claims against its prior real estate and closing attorney.

## D. The Debtor Filed for Chapter 11 in Good Faith

53. Contrary to CSMC's self-serving assessment, the Debtor seeks to use the Chapter 11 proceeding for a legitimate purpose of (i) reorganizing the Debtor's financial obligations; (ii) rehabilitating the Property by completing the necessary renovations to obtain a proper certificate of occupancy and install an automatic sprinkler system; and (iii) pursuing claims for misconduct against Column Financial, Bank of America and CSMC, and for malpractice against the attorney who represented the Debtor in connection with the mortgage loan. The fact that the Debtor in its Funding Motion seeks authority to take advantage of 11 U.S.C. §§ 363(c)(2)(B) and 364(d) is not bad faith since analogues rights do not list outside of bankruptcy.

54. Irrespective of the outcome of the adversary proceeding, the Debtor will have a number of potential reorganization options. Reorganization may be predicated upon a sale of the Property, investment of new capital, or the conversion of the Property to condominiums, all of which will be viable options once the certificate of occupancy is issued.

55.     Additionally, some courts have concluded that the "underlying purpose of Chapter 11 . . . is to **rehabilitate** the debtor and offer a fresh start." In re Fitzgerald Group, 38 B.R. 16, 18 (Bankr. S.D.N.Y. 1983) (emphasis added). "For these purposes, the term 'rehabilitate' means to put back in good condition; re-establish on a firm, sound basis. It is not synonymous with the term 'reorganize." In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995).   Rehabilitating the Property by allowing the Debtor to install an automatic sprinkler system and procure a residential certificate of occupancy promotes the purpose of the Bankruptcy Code and indicates that the Debtor's filing was made in good faith.

56.     A creditor's effort to dismiss a chapter 11 case was denied under similar circumstances where the petition was filed to rehabilitate a distressed property. In In re 68 West 127 Street, LLC, 285 B.R. 838 (Bankr. S.D.N.Y. 2002), the Hon. Robert Drain held that a chapter 11 petition filed by a debtor corporation with no income and no employees, and only one asset, an empty and derelict residential building scheduled for foreclosure on the same day as the petition was filed, was not a bad faith filing so as to permit relief from the automatic stay to allow the foreclosure to proceed.  In so holding, the Court found the debtor which sought to rehabilitate the dilapidated building sought to use chapter 11 for a legitimate goal. Id. at 847. Further, Judge Drain found there was a reasonable possibility of confirming a plan, despite the debtor having no income and lacking any equity in the property at issue, based on active negotiations between the debtor and its principal to underwrite the debtor's reorganization. Id. at 847-48.

57.     Although CSMC asserts that it purportedly controls all voting under any plan of reorganization that the Debtor will be unable to reorganize without its

consent, such an argument is highly speculative given the current dispute over the validity of CSMC's alleged secured claim and the potential existence of an impaired class that does not include CSMC.

58.     A decision by the Hon. Allan Gropper in the General Growth Properties, Inc. bankruptcy case is highly relevant to this point. There, Metlife, a secured creditor of certain allegedly bankruptcy-remote debtors, moved to dismiss the debtors' bankruptcy cases less than two months after the debtors' filed for bankruptcy. Metlife claimed that dismissal was appropriate because the debtors' reorganization efforts were objectively futile since the debtors would not be able to confirm a plan of reorganization over the creditor's opposition. The Court concluded that "[i]n making this argument, it is Metlife that is acting prematurely. There is no requirement in the Bankruptcy Code that a debtor must prove that a plan is confirmable in order to file a petition. Courts have consistently refused to dismiss on this ground before a plan has been proposed. **These cases reflect the reality that parties often find it in their best interests to agree on the terms of a plan, despite their litigating posture** . . ." In re Gen. Growth Props., Inc., 409 B.R. 43, 65 (Bankr. S.D.N.Y. 2009) (internal citations omitted) (emphasis added).

59.     So too is CSMC posturing. The Debtor should be given the opportunity to rehabilitate the Property and develop a plan of reorganization. It is possible that once this is accomplished, CSMC will become more amenable to supporting the Debtor's plan of reorganization, and, even if not, it is possible that the Debtor will not need to rely upon CSMC's votes if CSMC is unimpaired, if CSMC's votes are designated, or if an impaired class that does not include CSMC votes to accept the plan of reorganization. Accordingly, CSMC overplays its purported "veto" power in bankruptcy.

**E. CSMC Has Unclean Hands and Should Not Be Permitted to Request the Relief It Has Sought**

60.     CSMC requests that the Court use its equitable power and grant its motion and dismiss the Chapter 11 case or lift the automatic stay. However, the "good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors **and creditors** with 'clean hands." Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986).

61.     The "clean hands" requirement exists because "[a] litigant seeking relief must have 'acted fairly and without fraud or deceit as to the controversy in issue." 1633 Broadway Mars Rest. Corp. v. Paramount Group, Inc. (In re 1633 Broadway Mars Rest. Corp.), 388 B.R. 490, 500 (Bankr. S.D.N.Y. 2008) (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814-15 (1945). "The defense of unclean hands requires the party asserting the affirmative defense to prove that (1) the offending party is guilty of immoral, unconscionable conduct; (2) the conduct was relied upon by the asserting party and (3) the asserting party was injured as a result." Cohen v. Treuhold Capital Group, LLC (In re Cohen), 422 B.R. 350, 381 (E.D.N.Y. 2010).

62.     As explained above, CSMC and/or its predecessors into whose shoes CSMC steps have acted improperly based upon the following:

- Misrepresented to the Debtor a substantial value for the Property without disclosing to it any of the legal consequences of operating without a residential certificate of occupancy;

- Encouraged the Debtor to incur indebtedness when it was known or should have been known that the Debtor could never satisfy the debt if the Property lacked a certificate of occupancy;

21

- Improperly called an event of default for non-payment even though the Debtor was not legally permitted to collect rent and even though the Debtor's lender is not legally permitted to demand principal and interest payments while the Property lacks a residential certificate of occupancy; and

- Indicated to the Debtor a willingness to negotiate a workout prior to the Chapter 11 case, but, simultaneously and without notice, filed a foreclosure action and moved for the appointment of a receiver.

## THERE IS NO BASIS TO LIFT THE
## AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)

63.     CSMC alternatively requests relief from the automatic stay either for cause or because of the alleged lack of value in the Property. Both contentions are wrong. To begin with, cause does not exist since the Debtor has not acted in bad faith and its efforts to install a new sprinkler system will enhance the value of the Property and derivatively, CSMC's collateral position.

### A. There Is No "Cause" That Justifies Lifting the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1)

64.     CSMC claims that Mymon's alleged "bad faith in filing its chapter 11 petition constitutes 'cause' to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1)." (Motion ¶ 28) As explained above, Mymon filed for Chapter 11 protection in good faith. Because Mymon filed in good faith, it cannot be alleged that the filing of the Chapter 11 Case justifies lifting the automatic stay.

65.     Even had CSMC made a prima facie case establishing bad faith, relief under section 362(d)(1) is not appropriate because the Debtor has established a reasonable possibility of successful reorganization within a reasonable time.

66.     Moreover, the cases cited by CSMC on this point are easily distinguishable. For example, in the primary case upon which CSMC relies, In re Kaplan

22

Breslaw Ash, LLC, 264 B.R. 309, 320 (Bankr. S.D.N.Y. 2001), the Hon. Robert Gerber specifically found that the Chapter 11 was filed "to exploit section 362's automatic stay not for a temporary 'breathing spell,' but rather, as a means to maintain ownership of the Warehouse without satisfying the debt associated with it, and to effect delay, and, if possible, a total blockage, of Mortgageholder remedies." The debtor in that case was a serial filer who was the subject of a chapter 11 case that was dismissed in the District of New Jersey Id. at 316-17. Additionally, the court did not issue its opinion on the motion to lift the stay until more than one hundred (100) days after the debtor filed its petition. Id. During that period, the debtor did not make any adequate protection payments, as now required under 11 U.S.C. § 362(d)(3), and failed to indicate an intention to pay post-petition taxes. Id. at 318. There is also no indication that the debtor made any meaningful efforts to advance the rehabilitation of its business.

67. By contrast, here the Debtor is seeking a breathing spell so that it could rehabilitate the Property, reorganize its obligations, and repay creditors to the extent their claims are allowed. In view of the pending adversary proceeding and the Funding Motion, Mymon has taken meaningful steps to advance the rehabilitation of the Property. At this point, there simply is no basis for the assertion that the Debtor is acting in bad faith in pursuing this Chapter 11 case so as to warrant vacatur of the automatic stay.

68. SMC has also suggested that the automatic stay should be lifted for cause because CSMC's claim is not adequately protected during the pendency of this Chapter 11 case. (Motion ¶ 30) CSMC has the burden to prove that it is not adequately protected and has failed to do so. In re Sonnax Indus., Inc., 907 F.2d 1280, 1285 (2d Cir.

1990). CSMC claims that "[i]n the meantime, the Property is declining in value. The [New] Appraisal demonstrates that the Property's value has declined from its $11 million purchase price in 2007 to approximately $7.1 million presently." (Motion ¶ 33) However, the New Appraisal is dated February 8, 2010, almost four months before the Chapter 11 Case began.

69.     CSMC has made no showing or allegation that the Building has depreciated in value since the New Appraisal was commissioned or, more relevantly, has depreciated in value since the Chapter 11 case began.  Further, the Funding Motion explains that CSMC will be adequately protected, if the relief requested in the Funding Motion is granted, by Mymon's applying the Capital Reserve and DIP Loan funds to the installation of an automatic sprinkler system and procurement of a residential certificate of occupancy.  Because these improvements will at least maintain, if not increase, the value of the Building, CSMC will be adequately protected by the Debtor's remediation efforts.

70.     It should also be noted that the New Appraisal made by the Leitner Group must be viewed skeptically since it was issued by the same firm that previously appraised the Property for more than double this amount.   While the economy has declined since then, such a dramatic drop in value is difficult to comprehend.  It is more likely that both of the appraisals reflect a series of assumptions and conclusions by the preparer that were directed more toward reaching a preordained result, undermining their creditability.

**B. There Is No Basis for Stay Relief Pursuant to 11 U.S.C. § 362(d)(2)**

71.     In the Motion, CSMC also requests relief from the automatic stay pursuant to section 362(b)(2) of the Bankruptcy Code. Section 362(d)(2) of the Bankruptcy Code provides that the automatic stay may be lifted with respect to estate property only if (a) the debtor does not have equity in such property, and (b) such property is not necessary to an effective reorganization. See 11 U.S.C. § 362(d)(2). The party seeking stay relief has the ultimate burden to prove that the debtor lacks equity in the property, and the debtor has the burden to show that the property is necessary to an effective reorganization. Both of these elements must be satisfied before the stay may be lifted. See Oligbo v. Louis (In re Oligbo), 328 B.R. 619, 652-53 (Bankr. E.D.N.Y. 2005); In re Worldcom, Inc., Case No. 02-13533 (ALG), 2003 WL 22025051, *4 (Bankr. S.D.N.Y. Jan. 30, 2003).

72.     Initially, the party seeking relief from the stay under section 362(d)(2) must establish (1) the amount of its claim; (2) that its claim is secured by a valid, perfected lien in property of the estate; and (3) that the debtor lacks equity in the property. See 11 U.S.C. § 362(d)(2); In re Worldcom, Inc., Case No. 02-13533 (ALG), 2003 WL 22025051, *4 (Bankr. S.D.N.Y. Jan. 30, 2003); In re Elmira Litho, Inc., 174 B.R. 892, 900-901 (Bankr. S.D.N.Y. 1994).

73.     CSMC cannot prove that it is secured by a valid, perfected lien on the Property because its claim is disputed and the subject of an adversary proceeding.

74.     Also, CSMC has not proven that the Debtor lacks equity in the Property. A debtor has equity in property if the value of the property exceeds the amount of the secured debt. See In re Worldcom, Inc., 2003 WL 22025051, at *4; In re Elmira Litho, Inc., 174 B.R. at 901. A creditor must provide sufficient evidence of valuation

regarding the property and secured claims for the court to determine whether the debtor has equity in the subject property. Absent such demonstration by the creditor, the motion for relief from the stay must be denied. See In re Eatman, 182 B.R. 386, 390 (Bankr. S.D.N.Y. 1995); In re J.B.S. Mgmt. Corp., 165 B.R. 357 (Bankr. E.D.N.Y. 1994); In re Elmira Litho, Inc., 174 B.R. at 901-02;

75.    SMC has failed to satisfy its requirement of establishing that the Debtor lacks equity in the Building. CSMC contends that the Property is worth less than $7.1 million; however, that assessment is not based upon the proposed disposition or use of the Building as a condominium. See In re Diplomat Elecs. Corp., 82 B.R. 688, 692 (Bankr. S.D.N.Y. 1988) ("Where the rub occurs is in arriving at an appropriate value. The Code provides no bright-line test for this purpose but leaves to the courts the proper valuation of collateral, **to be determined in light of the purpose of the valuation and of the proposed disposition or use of the property**.") (emphasis added). Eastern Consolidated's appraisal estimate, the only evidence before the Court about the value of the Property if converted to a condominium (as the Debtor contemplates doing), suggests that the Debtor has equity in the Building and that the condition specified in 11 U.S.C. § 362(d)(2)(A) is not here present.

76.    As explained above, reliance upon the New Appraisal is inappropriate because it was completed before the onset of this Chapter 11 Case and, truly does not address any current decline value; and further because its conclusions appear to be the product of a series of assumptions and conclusions by the preparer that were directed more toward reaching a preordained result. See In re J.B.S. Mgmt. Corp., 165 B.R. 357 (Bankr. E.D.N.Y. 1994) ("The evidence adduced was not of such quality

that the court could determine the current value of the real estate and decide whether the debtor lacks equity" for purposes of section 362(d)(2)); In re Elmira Litho, Inc., 174 B.R. at 901-02 (stay relief denied where creditor offered insufficient evidence of value of its collateral or other liens that it secured).

77.     Whether a property is necessary for an effective reorganization depends upon whether the debtor can show that its plan has a "reasonable prospect of success within a reasonable time." See In re 68 W. 127 St., LLC, 285 B.R. at 848. The Debtor submits that it has met this burden by virtue of its efforts to obtain financing so as to be in a position to remedy the lack of an automatic sprinkler system and residential certificate of occupancy, its efforts to litigate the validity of CSMC's claims, its efforts to solicit third party investors to fund a potential plan of reorganization, and its equity in the Property. See In re White Plains Dev. Corp., 140 B.R. 948, 951 (Bankr. S.D.N.Y. 1992) ("A motion for relief from the stay should not be turned into a confirmation hearing; the debtor need only show that where there is lack of equity, the proposed plan has a realistic chance of being confirmed and not patently unconfirmable."); In re 68 W. 127 St., LLC, 285 B.R. at 847 (finding that the valuation underlying debtor's plan was credible, and debtor earned right to make the case for confirmation, meeting threshold for necessary to reorganization for purposes of section 362(d)(2)); In re Island Helicopter Corp., 63 B.R. 809, 816 (Bankr. E.D.N.Y. 1986) (finding debtors met their burden of proof by demonstrating that the collateral was necessary to debtors' effective reorganization and a reasonable possibility existed that debtors would reorganize within a reasonable period of time).

78.     In sum, it is still far too early in this case, which was filed only about six weeks ago, for the Debtor's chances for reorganization to be blithely written off.  The Debtor is entitled to a reasonable opportunity at achieving a reorganization within a reasonable time.  United Savings Association v. Timbers of Inwood Forest Associates, Ltd., 484 U.S.365, 375-76 (1987).  Moreover, the Supreme Court duly noted that when a lift-stay motion is made in the early stages of a bankruptcy case, and particularly prior to the termination of exclusivity, the courts "demand less detailed showings" of reorganization prospects.  Id. at 376.

WHEREFORE, for all of the reasons advanced throughout, CSMC's motion should be denied in its entirety.

Dated: New York, New York
       June 21, 2010

GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
Attorneys for the Debtor
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By:
            Kevin J. Nash
            A Member of the Firm

H:\sylvia\word\Mymon Realty Inc. - (bankruptcy) MYMON 29040\Opposition to Motion to Lift Stay or Dismiss Case 06-21-10v3.doc

28